IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Gwendolyn Hightower, | ) | C/A No.: 1:14-2761-RBH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security Administration, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.     Relevant Background

    A.     Procedural History

In a fully favorable decision dated February 29, 2008, Administrative Law Judge ("ALJ") Albert A. Reed issued a fully favorable decision in Plaintiff's claim. Tr. at 114–16. Although a complete copy of this decision is not included in the record, the record

indicates Plaintiff was approved for a closed period of disability from June 2005 to September 2007. Tr. at 194.

Plaintiff filed a second application for benefits in July 2009, alleging she became disabled in January 2008. Tr. at 18. On January 21, 2011, ALJ Walter C. Herin, Jr., issued an unfavorable decision. Tr. at 117–38. The Appeals Council denied Plaintiff's request for review in a notice dated August 9, 2012. Tr. at 146–49. This court affirmed the Commissioner's decision on March 11, 2014. *See Hightower v. Comm'r of Soc. Sec. Admin.,* C/A No. 1:12-2728-RBH, 2014 WL 958045 (D.S.C. Mar. 11, 2015).

On February 22, 2011, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on January 22, 2011. Tr. at 140, 141, 180–81, 182–88. Her applications were denied initially and upon reconsideration. Tr. at 154–58, 161–62, 163–64. On January 23, 2013, Plaintiff had a hearing before ALJ Ethan Chase. Tr. at 73–110 (Hr'g Tr.). The ALJ issued an unfavorable decision on February 6, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 15–30. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–4. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on July 9, 2014. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 42 years old at the time of the hearing. Tr. at 77. She completed high school. *Id.* Her past relevant work ("PRW") was as short order cook, a housekeeper, a

teacher's aide, and a child daycare worker. Tr. at 104–05. She alleges she has been unable to work since January 22, 2011. Tr. at 180, 182.

> 2.    Medical History[1]

On November 26, 2008, John Bradley, Ph. D. ("Dr. Bradley"), evaluated Plaintiff in connection with her disability application at the request of her attorney. Tr. at 358–62. Plaintiff indicated she attended school for 12 years, but was uncertain as to whether she received a diploma or a certificate of attendance. Tr. at 358. She reported being in special education classes. *Id.* She indicated she had experienced symptoms of depression since age 20 and was treated with medications through the Aiken-Barnwell Mental Health Center ("ABMHC"). Tr. at 358–59. Plaintiff reported psychological difficulties and avoidance of others as a result of a history of breast cancer requiring bilateral mastectomies. Tr. at 359. She complained of difficulty sleeping, anhedonia, poor concentration, crying spells, motor retardation, fatigue, poor self-esteem, and suicidal ideation. Tr. at 359. She reported a recent history of hospitalization after attempting suicide and expressing homicidal ideations. *Id.* She indicated she was very forgetful, had difficulty being around crowds, and rarely left her home. *Id.* Dr. Bradley noted Plaintiff understood simple explanations and directions and was cooperative, but lacked persistence when confronted with difficult items. Tr. at 360. He indicated Plaintiff's affect was blunted and her mood was depressed. *Id.* Dr. Bradley indicated Plaintiff's

---

[1] Although the record includes numerous treatment notes related to Plaintiff's alleged physical impairments, her allegations of error relate solely to her mental impairments. Therefore, the undersigned has summarized only those records pertinent to Plaintiff's mental impairments.

thinking was "generally clear, goal directed and at a normal rate but was concrete." *Id.*

He assessed her memory and intelligence as being below average. *Id.* He indicated her

insight was poor and her judgment was fair. *Id.* Dr. Bradley assessed Plaintiff to have a

verbal IQ of 61, a performance IQ of 64, and a full scale IQ of 59. *Id.* He indicated

Plaintiff "was currently scoring in the mild mentally retarded range of intelligence." Tr.

at 361. Plaintiff's reading recognition and mathematics scores on the Wide Range

Achievement Test were equivalent to a fourth grade level. Tr. at 362. Dr. Bradley

indicated Plaintiff could understand and follow simple directions, communicate thoughts

and ideas, meet her personal needs, and identify and avoid simple dangers. Tr. at 362. He

diagnosed mild mental retardation and major depressive disorder, recurrent and moderate.

*Id.* He assessed Plaintiff as having a Global Assessment of Functioning ("GAF") score of

50.[2] *Id.*

---

[2] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders,* Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.* A GAF score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." *Id.* A GAF score of 51–60 indicates "moderate symptoms (e.g., circumstantial speech and occasional panic attacks) OR moderate difficulty in social or occupational functioning (e.g., no friends, unable to keep a job)." *Id.* A GAF score of 61–70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, [and] has some meaningful interpersonal relationships." *Id.*

Plaintiff was seen in the psychiatry department at MCG Health, Inc., on March 23, 2009. Tr. at 459. She complained of depression and requested her medications be increased. *Id.*

On May 18, 2009, Plaintiff reported to Anselmo Arthur, M.D. ("Dr. Arthur"), that she had recently been severely despondent and depressed because of problems with her daughter. Tr. at 417. She indicated she tried to take at least eight Tylenol PM the day before. *Id.* Dr. Arthur indicated he would refer Plaintiff to Aurora Pavilion for treatment. *Id.*

Records from ABMHC indicated Plaintiff initially presented for treatment on June 2, 2009, and was discharged from treatment on August 27, 2009.[3] Tr. at 684.

Dr. Bradley completed a medical opinion form on June 8, 2009, and indicated Plaintiff had fair abilities to do the following: remember work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in a routine work setting; be aware of normal hazards and take appropriate precautions; interact appropriately with the general public; maintain socially-appropriate behavior; and use public transportation. Tr. at 419–21. He indicated Plaintiff had poor abilities in the following areas: maintain attention for two-hour segment; maintain regular attendance and be punctual within customary, usually strict

---

[3] Although these dates are referenced, the record does not contain treatment notes for this period.

tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; deal with normal work stress; understand and remember detailed instructions; carry out detailed instructions; set realistic goals or make plans independently of others; deal with stress of semiskilled and skilled work; adhere to basic standards of neatness and cleanliness; and travel in unfamiliar places. *Id.* Dr. Bradley indicated his opinion was supported by clinical findings of mild mental retardation and depression. Tr. at 420, 421. He estimated Plaintiff would be absent from work more than four days per month because of her impairments or treatment. Tr. at 422. He indicated she could not manage benefits in her own best interest. *Id.*

Dr. Bradley also completed a psychiatric review technique form ("PRTF") on June 8, 2009. Tr. at 424–37. He indicated Plaintiff met Listings 12.04 and 12.05. Tr. at 424. He indicated Plaintiff had a disturbance of mood under Listing 12.04, accompanied by a depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide. Tr. at 427. Under Listing 12.05, he indicated Plaintiff had "[s]ignificantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment

before age 22," with "a verbal, performance, or full scale IQ of 59 or less" and "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Tr. at 428. Dr. Bradley checked boxes indicating Plaintiff had marked restriction of activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace. Tr. at 434.

In a treatment note dated January 15, 2010, Thomas A. Samuel, M.D., indicated Plaintiff had multiple ongoing psychological issues, including ongoing difficulties with depression and a recent nervous breakdown requiring hospitalization. Tr. at 534. He noted that Plaintiff had suicidal and homicidal ideations at the time of her hospitalization. *Id.* He indicated Plaintiff reported depression with episodic suicidal thoughts, but denied experiencing them at the time of the visit. Tr. at 535.

On March 23, 2011, Plaintiff presented to the emergency services department at MCG Health, Inc., complaining of a three-month history of increased depression. Tr. at 637. She stated she had been on Effexor for a year-and-a-half and felt it was no longer working. Tr. at 638. Plaintiff complained of being under stress and experiencing recent suicidal and homicidal ideations, and the clinician described her as having a tearful affect. Tr. at 633. Plaintiff reported increased crying spells, decreased energy, fluctuating appetite and weight, increased anxiety, preoccupation with death, nightmares, racing thoughts, and social withdrawal. Tr. at 635. Plaintiff appeared clean; was cooperative; demonstrated normal motor activity; spoke normally and fluently; was goal-directed in her thought processes; endorsed no suicidal or homicidal ideations; was alert and oriented

to all spheres; demonstrated normal immediate and recall memory; had good concentration; demonstrated a good general fund of knowledge; and had good insight. Tr. at 638. She was diagnosed with depression and anxiety. Tr. at 632. The provider instructed her to take her medication as prescribed, to avoid alcohol and other substances, and to follow up with ABMHC. *Id.*

During a visit to the internal medicine clinic on March 31, 2011, Plaintiff reported increased anxiety and depression and indicated she wanted to work with a counselor. Tr. at 659.

On April 5, 2011, Plaintiff presented to ABMHC for an initial clinical assessment. Tr. at 685. Plaintiff stated she was depressed as a result of medical problems and the deaths of several family members. *Id.* She endorsed suicidal ideations and a history of suicide attempts. *Id.* A mental status examination revealed Plaintiff to have lethargic motor activity; to be cooperative, but withdrawn; to have a flat and tearful affect; to have a depressed, hopeless, and passive mood; to have a normal rate and tone of speech; to have normal, appropriate, coherent, and relevant thought processes; to have ideas of hopelessness and worthlessness and paranoid thought content; to endorse auditory and visual hallucinations; to have no evidence of delusions; to be alert and oriented to person, place, time, and situation; to have poor decision making that adversely affected herself; to acknowledge, but fail to understand her problems; to be easily distracted; and to have an average fund of knowledge. Tr. at 687–88. Harry T. Douglas, M.D. ("Dr. Douglas") diagnosed major depression, recurrent. Tr. at 688. He assessed a GAF score of 50. *Id.*

Plaintiff followed up at ABMHC on May 3, 2011. Tr. at 695–97. She indicated her primary care physician prescribed 225 milligrams of Venlafaxine daily and requested a change in medication due to decreased mood and anhedonia. Tr. at 695. Plaintiff endorsed multiple stressors, but denied ongoing suicidal and homicidal ideations. *Id.* John A. Pybass, M.D. ("Dr. Pybass"), indicated Plaintiff's affect was not congruent with depressed mood and that she was highly animated and endorsed an entitlement mentality. *Id.* He indicated Plaintiff had a history of alcoholism with blackouts and continued to drink four beers at a time on three to four days per week. *Id.* He also indicated Plaintiff's history included two overdose attempts and intense interpersonal relationships. *Id.* He stated Plaintiff had significant affective instability with intense episodes of dysphoria, irritability, and anxiety lasting hours, as well as intense episodes of inappropriate anger. *Id.* Dr. Pybass diagnosed alcohol dependence, mood disorder, not otherwise specified ("NOS"), and borderline personality disorder. Tr. at 695–96. He assessed Plaintiff to have a GAF score of 50. Tr. at 696. Dr. Pybass targeted symptoms for treatment that included anxiety, depression, irritability, sleep/appetite disturbance, and thought disorganization. *Id.* He prescribed Abilify and instructed Plaintiff to follow up in a month. Tr. at 697–98.

During a May 12, 2011, primary care visit with J. Wells, M.D., Plaintiff denied suicidal and homicidal ideations and stated she was doing better on Abilify. Tr. at 708.

On June 2, 2011, state agency consultant Leslie Burke, Ph. D. ("Dr. Burke"), completed a PRTF and considered Listings 12.04 for affective disorders and 12.09 for substance addiction disorders. Tr. at 736. She found Plaintiff to have mood disorder, NOS, and alcohol dependence. Tr. at 739, 744. She assessed mild restriction of activities

of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 746. Dr. Burke also completed a mental residual functional capacity assessment ("RFC") and indicated Plaintiff had moderate limitations in the following abilities: to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others. Tr. at 750–51. She found Plaintiff to have the following abilities:

> She is able to understand and remember instructions and is capable of performing simple tasks without special supervision. She is capable of maintaining a regular work schedule, but may miss an occasional day due to psychological symptoms. She would perform better in a job setting that does not require ongoing interaction with the public. She can make simple work related decisions, request assistance from others, and use available transportation. She can adhere to basic standards of hygiene and safety.

Tr. at 752.

Plaintiff presented to Sherry L. Franklin, R.N., C., at ABMHC on June 8, 2011. Tr. at 965. She indicated her symptoms included anxiety, increased appetite, depression,

and irritability, but denied any side effects from her medications. *Id.* Plaintiff reported improved mood on Abilify and stated she was no longer crying and that her interests had increased. Tr. at 966. She stated she had started attending church and was making friends. *Id.* She also indicated she had reduced her alcohol consumption. *Id.*

On August 1, 2011, Dr. Pybass indicated Plaintiff had passive thoughts of self-harm, but no plan. Tr. at 776. Plaintiff complained of depressed mood and anhedonia. *Id.* Dr. Pybass observed Plaintiff's behavior to be labile and irritable to hostile and noted that she demonstrated some psychomotor agitation. *Id.* He indicated Plaintiff continued to drink three to four cans of beer once a week. *Id.* He increased Plaintiff's Abilify dosage to improve her mood stability and assessed a GAF score of 58. Tr. at 776–77.

A mental health progress summary dated October 3, 2011, indicates Plaintiff was not seen often because of knee surgery and physical therapy. Tr. at 805. Plaintiff reported that her family was demanding. *Id.* She also indicated she had recently been more tearful because of the death of her uncle and her cousin's terminal illness. *Id.* She indicated she continued to drink once or twice a week, but that she did not drink to excess. *Id.* The clinician indicated that Plaintiff should continue to receive assessment, group therapy, medication management, and psychotherapy focused on symptom relief. *Id.*

On October 20, 2011, Plaintiff presented to Christina Hendry, M.D. ("Dr. Hendry"), for a primary care follow up. Tr. at 948. Plaintiff voiced no complaints, but stated she desired to obtain all of her medications from one provider. Dr. Hendry indicated Plaintiff should continue to obtain Abilify from ABMHC and indicated she would not prescribe narcotics. *Id.* She indicated they spent a significant amount of time

discussing Plaintiff's depression and stressors. *Id.* She observed Plaintiff to demonstrate intermittent tearfulness while discussing life stressors and depression. Tr. at 950. Dr. Hendry indicated Plaintiff was overall stable mentally, but was still depressed. Tr. at 951.

On December 5, 2011, Dr. Pybass indicated Plaintiff's mood and affect were much improved and that she was getting out and exercising. Tr. at 973. Plaintiff denied paranoia, delusions, and suicidal and homicidal ideations. *Id.* She indicated she continued to drink "a beer or 2, three or four times a week." *Id.* Dr. Pybass encouraged Plaintiff to decrease her alcohol consumption. *Id.* He noted no abnormalities on mental status examination and assessed Plaintiff as having a GAF score of 62. Tr. at 973–74.

State agency consultant Craig Horn, Ph. D. ("Dr. Horn"), completed a PRTF on January 14, 2012, and considered Listings 12.02, 12.04, 12.06, 12.08, and 12.09. Tr. at 1094. He indicated Plaintiff had probable borderline intellectual functioning, mood disorder, depression, NOS, anxiety, NOS, borderline personality disorder, and alcohol abuse/dependence. Tr. at 1095–1102. Dr. Horn assessed Plaintiff to have mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 1104. In a mental RFC assessment, Dr. Horn found Plaintiff's abilities to be moderately limited in the following areas: to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; to interact appropriately with the general public; and to get along with coworkers or peers

without distracting them or exhibiting behavioral extremes. Tr. at 986–87. Dr. Horn indicated the following:

> She is able to remember location and work-like procedures. She is able to understand and remember short and simple instructions. She is able to carry out very short and simple instructions, but could not carry out detailed instructions. She is able to understand normal work-hour requirements and be prompt within reasonable limits. She retains the ability to make simple work-related decisions. She has the capacity to ask simple questions and request assistance from peers or supervisors. She would perform best in situations that do not require on-going interaction with the public. She would respond appropriately to changes in a routine work setting. She has the ability to be aware of personal safety and avoid work hazards. She retains the capacity to travel to and from work using available transportation.

Tr. at 988.

Plaintiff followed up with Dr. Hendry on May 7, 2012, and endorsed depression, sleeping all the times with little desire to get out of bed, and overeating. Tr. at 1044. Dr. Hendry observed Plaintiff's depression to be stable and recommended she follow up with ABMHC. Tr. at 1045.

A progress summary from ABHMC dated May 17, 2012, indicates Plaintiff had limited sessions because of numerous medical appointments. Tr. at 1063. The clinician indicated Plaintiff's mood was improved, but that she continued to have problems in interpersonal relationships. *Id.* Plaintiff indicated she provided most of the caregiving for her grandson. *Id.* She indicated she had limited her alcohol consumption. *Id.* The clinician indicated Plaintiff would continue to receive assessment, group therapy, medication management, and psychotherapy and assessed a GAF score of 61. *Id.*

Plaintiff was discharged from ABMHC on October 3, 2012, after failing to participate in treatment. Tr. at 1068. Her GAF score was 63 at the time of discharge. *Id.* the discharge summary indicates Plaintiff's last contact with ABMHC was on July 12, 2012, and that she had mild symptoms and had made some progress with depression at that time. *Id.*

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing on January 23, 2013, Plaintiff testified she completed twelfth grade and attended college for approximately four months. Tr. at 77–78. Plaintiff indicated she received a diploma as opposed to a special education certificate of completion. Tr. at 98. Plaintiff testified she stopped working when she was diagnosed with breast cancer in 2005. Tr. at 78. She stated she worked in the past as a substitute teacher, a housekeeper, and a fast food cook. Tr. at 78–79. She stated she was 5'8" tall and weighed 260 pounds. Tr. at 87.

Plaintiff testified she was unable to return to work because of problems with her right leg and back. Tr. at 79. She indicated she had right knee surgery and that she continued to have problems with spurs in her right foot. Tr. at 79–80.

Plaintiff testified she took medication for her knees and for restless leg syndrome. Tr. at 83. She stated she experienced no pain when she took Hydrocodone, but that her pain could be up to a 10 if she did not take medication. Tr. at 85. She also indicated she

took Abilify and Effexor for depression. Tr. at 87–88. Plaintiff stated her medications caused drowsiness and that she needed to lie down. Tr. at 92.

Plaintiff testified that her depression medications helped to reduce her crying. Tr. at 88. She indicated she cried once or twice a day. *Id.* She stated she had difficulty remembering and concentrating and was easily frustrated. *Id.* Plaintiff indicated she experienced shortness of breath when she became anxious. Tr. at 90. She stated that she felt uncomfortable around others because of her history of breast cancer and reconstructive surgery. Tr. at 97.

Plaintiff testified she had recently experienced some wheezing, but that she was no longer on a nebulizer or an inhaler. Tr. at 99. She stated she had migraines once a week that sometimes lasted all day and required she lie down. Tr. at 99–100.

Plaintiff testified she had difficulty walking and problems sitting for "a long period of time." Tr. at 80. She indicated she walked with a cane because of impaired balance. Tr. at 81. She testified she had arthritis that caused mid-back pain and limited her ability to bend. Tr. at 82. She indicated she could sit for two hours at a time. Tr. at 83–84, 100. She testified she had difficulty climbing stairs because of weakness in her leg. Tr. at 93. She indicated she could walk for 15 minutes at a time and for 30 minutes during a workday. Tr. at 93–94. She stated she elevated her legs for about three hours per day to reduce swelling. Tr. at 101. She indicated she could lift 10 to 12 pounds. Tr. at 102. She stated she experienced stiffness in her right hand and that it tired quickly and cramped when she was writing. *Id.*

Plaintiff testified she lived with her two children, ages 14 and 23. Tr. at 86. She indicated both of her children had ADHD, but that her daughter helped her with some household chores. *Id.* She stated that she was able to shower and dress herself, but that she had difficulty bending to get in the tub and put on her shoes. Tr. at 86–87. She stated that she had difficulty washing dishes because she developed tingling in her foot and weakness in her knee. Tr. at 94–95. She indicated she experienced back pain when washing and drying clothes. Tr. at 95.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Carey Washington reviewed the record and testified at the hearing. Tr. at 104–08. The VE categorized Plaintiff's PRW as a short order cook, which is light with a specific vocational preparation ("SVP") of three; a housekeeper, which is light work with a SVP of two; a teacher's aide, which is light with a SVP of three; and a child daycare worker, which is light with a SVP of four. Tr. at 104–05. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform sedentary work involving only occasional foot control operations, use of ramps or stairs, and balancing or stooping; no climbing of ladders, ropes, or scaffolds; no kneeling, crouching, or crawling; should avoid exposure to extreme heat and humidity, unprotected heights, and driving as part of the job duties; and was limited to unskilled work with SVPs of one and two that involved only occasional interaction with the public and coworkers. Tr. at 105. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs in the region or national economy that the hypothetical person could perform. *Id.* The VE

16

identified sedentary jobs with an SVP of two as an addresser, *Dictionary of Occupational Titles* ("*DOT*") number 209.587-010, with 3,000 positions in South Carolina and 125,000 positions nationally; a weight tester, *DOT* number 539.485-010, with 5,000 positions in South Carolina and 175,000 positions nationally; and a surveillance systems monitor, *DOT* number 379.367-010, with 3,000 positions in South Carolina and 150,000 positions nationally. Tr. at 106. The ALJ next asked the VE to assume the same hypothetical individual would be off task for a variety of reasons for about 20 percent of the day. *Id.* The ALJ asked if such a limitation would be acceptable in the jobs identified. *Id.* The VE testified that it would preclude the jobs identified and any other substantial, gainful work activity. *Id.*

Plaintiff's attorney asked the VE to assume the same limitations set forth in the first hypothetical, but to include a need for a cane for ambulation and if standing for more than a few minutes, as well as the need to shift positions on an hourly basis. Tr. at 106–07. He asked if those limitations would reduce the jobs the individual could perform. Tr. at 107. The VE testified that such restrictions would preclude work. *Id.* Plaintiff's attorney next asked the VE to assume the hypothetical individual would have marked restriction in activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace. Tr. at 108. He asked if someone with those mental restrictions would be able to perform competitive work activity. Tr. at 108. The VE testified that an individual with those restrictions would be unable to perform any work activity in the competitive labor market. *Id.* As a third hypothetical question, Plaintiff's attorney asked the VE to assume

the individual had a poor ability to maintain attention for two-hour segments. *Id.* The VE indicated that a greater level of concentration was required even in unskilled work. *Id.*

### 2.     The ALJ's Findings

In his decision dated February 6, 2013, the ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2012.
2.  The claimant has not engaged in substantial gainful activity since January 22, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.  The claimant has the following severe impairments: Degenerative Disc Disease; Degenerative Joint Disease/Osteoarthritis; Obesity; Mood Disorder; Borderline Personality Disorder; Borderline Intellectual Functioning; Alcohol Abuse (20 CFR 404.1520(c) and 416.920(c)).
4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: she can only occasionally operate foot controls; she can never climb ladders, ropes, or scaffolds; she can only occasionally climb ramps or stairs; she can never kneel, crouch, or crawl; she can only occasionally balance and stoop; she must avoid exposure to extreme heat, humidity, hazards, heights, and driving; she is limited to unskilled work with only occasional public interaction and occasional interaction with coworkers.
6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).
7.  The claimant was born on August 19, 1970 and was 40 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).
8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).
9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has

transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from January 22, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 21–30.

### 3.    Appeals Council Review

In a decision dated May 6, 2014, the Appeals Council denied Plaintiff's request for review. Tr. at 1–4. The Appeals Council indicated it considered the reasons Plaintiff disagreed with the ALJ's decision, but found that the information did not provide a basis for changing the ALJ's decision. Tr. at 1–2. It incorporated counsel's pre-hearing brief into the record and considered it. Tr. at 2. It also indicated that, although the exhibit list did not reflect the PRTF completed by Dr. Horn on January 14, 2012, the ALJ did consider it. *Id.* It made the exhibit part of the record, as well. *Id.*

## II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ failed to properly assess opinion evidence; and

2)    the ALJ did not properly evaluate Plaintiff's mental impairment based on the criteria of Listing 12.05

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146

impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v.*

---

(1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

*Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Opinion Evidence

Plaintiff argues the ALJ failed to properly assess Dr. Bradley's opinion. [ECF No. 19 at 17–24]. She contends the ALJ did not adequately consider the evidence that supported the opinion. *Id.* at 20. She maintains that the ALJ failed to consider substantial evidence of her long-term struggle with depression. *Id.* at 21–22. She argues that the medical evidence, particularly in light of Dr. Bradley's opinion, does not support the ALJ's mental RFC finding. *Id.* at 22.

The Commissioner argues that substantial evidence supports the ALJ's decision to give little weight to Dr. Bradley's opinion because it was rendered more than 18 months prior to the relevant period; evidence suggested Plaintiff's mental condition improved with treatment; and the opinion was inconsistent with the record as a whole. [ECF No. 21 at 1].

SSA rules require that the ALJ carefully consider medical opinions on all issues. SSR 96-5p. Pursuant to 20 C.F.R. §§ 404.1527(c) and 416.927(c), if a treating source's opinion is not accorded controlling weight, the ALJ should consider "all of the following factors" to determine the weight to be assigned to every medical opinion in the record: examining relationship; treatment relationship, including length of treatment relationship and frequency of examination and nature and extent of treatment relationship;

supportability; consistency with the record as a whole; specialization of the medical source; and other factors. *See also Johnson*, 434 F.3d at 654. The ALJ's decision must explain the weight accorded to all opinion evidence. 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii). In all unfavorable and partially-favorable decisions and in fully-favorable decisions based in part on treating sources' opinions, the ALJ must include the following:

> [T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight.

SSR 96-2p.

The ALJ considered Dr. Bradley's opinion in determining that Plaintiff's impairments did not meet or equal a Listing and in assessing Plaintiff's RFC. *See* Tr. at 22–23, 28. He found that Plaintiff did not demonstrate the deficits in adaptive functioning necessary to meet the requirements of Listing 12.05. Tr. at 22–23. He also found that Plaintiff did not demonstrate at least two of the following criteria necessary to meet the part "B" criteria under Listings 12.02, 12.04, and 12.08: marked restriction of activities of daily living; marked difficulty in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. Tr. at 23. He instead concluded that Plaintiff had moderate restriction in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and

no episodes of decompensation and explained his reasons for such conclusions. *Id.* In

assessing Plaintiff's RFC, the ALJ noted the following regarding Dr. Bradley's opinion:

> The record also includes a medical source statement from John B. Bradley,
> Ph. D., a psychologist who examined the claimant in connection to her
> previous application. These statements, both dated June 2009, indicate that
> the claimant meets listings 12.04 (affective disorders) and 12.05 (mental
> retardation). He also indicated [she] has significant mental barriers to
> working, and that because of her symptoms, she would miss more than four
> [days] of work per month. (Exhibits C6F; C7F). I gave little weight to these
> opinions because they were given long before the alleged onset date, and
> they are inconsistent with the objective evidence. As is noted above, the
> record shows that the claimant's condition is well controlled on her current
> medication regimen.

Tr. at 28.

The undersigned recommends the court find the ALJ appropriately considered Dr.

Bradley's opinion and that substantial evidence supports his decision to accord it little

weight. In accordance with the requirements of 20 C.F.R. §§ 404.1527(c) and 416.927(c),

the ALJ noted the examining relationship between Plaintiff and Dr. Bradley and Dr.

Bradley's specialization as a psychologist. *See id.* However, he determined that the lack

of a treatment relationship, the lack of support for Dr. Bradley's opinion in examination,

the opinion's inconsistency with the record as a whole lent little weight to it. *See id.*

The ALJ explained his reasons for concluding Plaintiff had less than marked

limitations in activities of daily living, maintaining social functioning, and maintaining

concentration, persistence, or pace and did not demonstrate deficits in adaptive

functioning consistent with Listing 12.05. Tr. at 22–23. The ALJ noted that Plaintiff

completed high school and attended college; worked as a substitute teacher, a

housekeeper, and a cook; exercised; was capable of performing household chores that

included laundry, ironing, and sweeping; shopped alone; was able to function in a largely independent manner; lived with her children; attended church; made friends; and had intact attention, concentration, and memory during examinations. Tr. at 23. These findings were supported by evidence in the record, including Plaintiff's indications to her physicians, her testimony, and a disability report, which indicated she worked in several different kinds of jobs; completed high school and attended college; lived with family; performed household chores that included preparing meals, sweeping, washing dishes, and doing laundry; exercised by walking; went out alone to shop twice a month; attended church and made new friends; and was able to pay bills, count change, handle a savings account, and use a checkbook and money orders. *See* Tr. at 77–79, 94–95, 98, 264–71, 966.

Although Plaintiff argues the ALJ ignored her long-term struggle with depression, the undersigned finds that argument to be without support. The ALJ discussed Plaintiff's symptoms of depression during the relevant period, but found that her symptoms improved significantly with use of prescribed medication and counseling. Tr. at 26. He cited records from ABMHC that showed Plaintiff's symptoms of depression to be mild at the time of her discharge. Tr. at 27. The ALJ's conclusion was supported by the record that showed Plaintiff's symptoms to improve when she took prescribed medication and participated in mental health treatment. *See* Tr. at 708, 966, 973, 1063, 1068. Furthermore the ALJ found mood disorder, borderline personality disorder, and borderline intellectual functioning to be severe impairments and assessed restrictions consistent with these impairments and the findings in the record by limiting Plaintiff to unskilled work with

only occasional public interaction and only occasional interaction with co-workers. Tr. at 21, 24.

The ALJ further supported his conclusion by noting that Dr. Bradley's opinion was rendered in the context of Plaintiff's previous application and "given long before the alleged onset date." This factor is particularly relevant in that it indicates that the ALJ was likely aware that the opinion was considered and rejected by the prior ALJ.[6] The ALJ was required to look at Plaintiff's longitudinal functioning, but the relevant period was that from January 21, 2011, through the date of his decision. Although Plaintiff notes that she struggled with depression since age 20 and had two prior suicide attempts, that evidence was in the record and was considered by the prior ALJ, who found she was not disabled. The undersigned recommends a finding that the ALJ properly concluded that Dr. Bradley's opinion did not reflect Plaintiff's mental functioning during the relevant period.

2.     Listing 12.05

a.     General Consideration of Listing 12.05

Plaintiff argues the ALJ did not properly evaluate whether her impairment met or equaled the criteria of Listing 12.05. [ECF No. 19 at 24–30]. She contends that the ALJ improperly concluded that she did not have deficits in adaptive functioning based on her work history. *Id.* at 27. She submits that her activities of daily living were not incompatible with the IQ scores assessed by Dr. Bradley. *Id.* at 28.

---

[6] This court considered this same opinion by Dr. Bradley as part of the prior action and concluded that substantial evidence supported that ALJ's decision to accord little weight to the opinion. *See Hightower,* 2014 WL 958045 at *5.

The Commissioner argues that substantial evidence supported the ALJ's finding that Plaintiff's impairment did not meet part "C" of Listing 12.05 because Plaintiff did not demonstrate deficits in adaptive functioning. [ECF No. 21 at 1]. She submits that Plaintiff's treating mental health providers did not diagnose an intellectual disability. *Id.* at 11. She also maintains that Plaintiff's work history, daily activities, and educational history do not suggest deficits in adaptive functioning. *Id.* at 13.

The introductory paragraph to Listing 12.05 provides the following: "intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 12.05. To meet the required level of severity for a finding of disability under Listing 12.05, the claimant must meet the definition of intellectual disability set forth in the introductory paragraph to the listing plus the requirements in either part A, B, C, or D.[7] *Id.*; *see also Hancock v. Astrue*, 667 F.3d 470, 475 (4th Cir. 2012).

"Deficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Jackson v. Astrue*, 467 F. App'x 214, 218 (4th Cir. 2012), citing *Atkins v. Virginia*, 536

---

[7] Because a claimant must meet both the criteria in the introductory paragraph and the criteria under A, B, C, or D, it is unnecessary to consider the criteria under A, B, C, or D if the ALJ's conclusion that Plaintiff did not demonstrate deficits in adaptive functioning is supported by substantial evidence.

U.S. 304, 309 n.3 (2002). In *Atkins*, the Supreme Court indicated intellectual disability was characterized by "significant limitations" in at least two of the areas of adaptive functioning in conjunction with significantly subaverage general intellectual functioning. *Atkins*, 536 U.S. at 309 n.3.

The ALJ considered Listing 12.05, but concluded that Plaintiff's impairment did not meet the Listing for the following reasons:

> A Dr. Bradley had examined the claimant a year and a half prior to the alleged onset date. He indicated that he believes that the claimant meets listings 12.04 (affective disorders) and 12.05 (mental retardation). In regards to his finding that the claimant had mild mental retardation, the claimant has not demonstrated the deficits in adaptive functioning that would be expected from someone that is mentally retarded. The claimant has reported that she completed high school, and she even indicated that she has worked as a substitute teacher (Exhibit C3E). She further testified that she attended college for a short period and that she has held jobs as a housekeeper and cook. This does not show the deficits in adaptive functioning consistent with Dr. Bradley's determination that the claimant is functioning in the mentally retarded range of intellectual functioning. Therefore, I concluded that she does not meet Listing 12.05.

Tr. at 22–23.

The undersigned recommends a finding that substantial evidence supports the ALJ's conclusion that Plaintiff did not demonstrate deficits in adaptive functioning required to support disability under Listing 12.05. The ALJ specifically cited Plaintiff's educational and work history as being inconsistent with a finding of significant deficits in adaptive functioning. *See id.* The ALJ's conclusions were consistent with Plaintiff's indications in a disability report that she completed the twelfth grade in June 1988 and

did not attend special education classes[8] and a work history report in which she wrote that she worked as a substitute teacher from 1988 to 1992 and from 2002 to 2005, a cook from 1994 to 1998, a housekeeper from 1999 to 2001, and a caregiver in a daycare from 2001 to 2002. Tr. at 256, 272. Although Plaintiff argues that the ALJ should have considered her daily activities, a review of the entire decision reveals that he did so. *See* Tr. at 23 (noting that Plaintiff was capable of performing many chores, can go shopping alone on a monthly basis, is able to function in a largely independent manner, maintains substantial social skills, and has intact attention, concentration and memory). Although Plaintiff suggests that problems performing daily activities demonstrated deficits in adaptive functioning, Plaintiff generally indicated that her difficulties in performing daily activities resulted from her other impairments. *See* Tr. at 264 (hard to focus due to medications, headaches, shortness of breath, mood swings, and leg and knee pain), 265 (needs encouragement to perform household chores when feeling depressed), 267 (never wanted to drive because of a fear of other cars and big trucks).

The ALJ's finding that Plaintiff did not have deficits in adaptive functioning consistent with Dr. Bradley's opinion is also supported by the ALJ's indication that Dr.

---

[8] This is in contrast to Plaintiff's testimony and her statement to Dr. Bradley indicating she was enrolled in special education classes. *See* Tr. at 98, 358. The record does not include Plaintiff's school records and Plaintiff's attorney indicated on the record that he was unable to obtain them. *See* Tr. at 98. Although it is impossible to determine with certainty whether Plaintiff was enrolled in special education classes, the undersigned notes that Plaintiff indicated she received a high school diploma as opposed to a special education certificate of completion. *See id.*

Bradley's opinion was rendered in the context of the prior claim. Tr. at 28.[9] The prior ALJ considered the exact opinion from Dr. Bradley that is at issue and found that Plaintiff did not have deficits in adaptive functioning. Because the prior ALJ's decision was affirmed by this court and not appealed further, res judicata establishes that the ALJ could not find Plaintiff disabled under Listing 12.05 prior to January 21, 2011. Plaintiff presented no evidence in addition to that before the prior ALJ to suggest Plaintiff had deficits in adaptive functioning prior to age 22.

The undersigned further recommends the court reject Plaintiff's argument that her impairment met part C of Listing 12.05. Plaintiff asserts that "there is nothing about her activities that is incompatible with the IQ scores found by Dr. Bradley" and proceeds to present an argument to support the IQ scores. [ECF No. 19 at 28]. Part C of Listing 12.05 specifies "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 12.05(C). To satisfy the requirements of Listing 12.05(C), a claimant must prove that her impairment meets all three prongs for a finding of disability under the Listing: deficits in adaptive functioning during the developmental period, a valid IQ score of 60 through 70, and another physical or mental impairment that causes an additional and significant work-related limitation of function. *See Hancock* at 475. If a claimant fails to satisfy any of these three prongs, a

---

[9] This court considered as part of Plaintiff's prior action whether she met Listing 12.05 and affirmed the ALJ's determination that she did not. *See Hightower*, 2014 WL 958045 at *4. The court found the prior ALJ's conclusion that Plaintiff did not demonstrate deficits in adaptive functioning to be supported by substantial evidence. *See id.*

decision that she is disabled is not supported under Listing 12.05(C). *Id.* Plaintiff correctly asserts that the ALJ did not invalidate the IQ scores assessed by Dr. Bradley. [ECF No. 19 at 22]. In fact, the ALJ neglected to address the validity of the IQ scores. However, because he found Plaintiff did not have deficits in adaptive functioning, Plaintiff failed to meet all three prongs required for a finding of disability under Listing 12.05(C).

> b.    Consideration of Prior ALJ's Findings Regarding Deficits in Adaptive Functioning Under Listing 12.05

Plaintiff argues that the ALJ was required to consider the findings of the previous ALJ with respect to deficits in adaptive functioning. [ECF No. 19 at 29–30]. Plaintiff states the following:

> The previous ALJ had conceded there was a significant deficit in adaptive functioning, but found Listing 12.05 was not met applying the old DSM-IV-R criteria for ID (intellectual disability), which required deficits in two areas. Hightower submits this analysis was erroneous, as the Listing does not require deficits in multiple areas. Further, the current DSM-V requires a deficit in only one broad area (as the ALJ found), to meet the criteria. There certainly is no requirement to apply any DSM criteria in evaluating whether a claimant meets a listing, and proper consideration by the ALJ in this case regarding the prior finding on this matter could have changed his evaluation.

*Id.* at 30.

The Fourth Circuit issued *Albright v. Comm'r of Soc. Sec. Admin*, 174 F.3d 473, 475 (4th Cir. 1999), in response to an SSA ruling that prevented claimants from obtaining benefits on second and subsequent applications unless they could "produce new and material evidence" that their impairments increased in severity from the date of the prior finding. In striking down the ruling, the court explained that the ruling "operates to

mechanistically merge two claims into one" and "carves out an exception to the general rule that separate claims are to be considered separately." *Id.* at 476. The SSA policy at issue in *Albright* was promulgated in response to the Fourth Circuit's decision in *Lively v. Secretary of HHS*, 820 F.2d 1391 (4th Cir. 1987), where the court held that the prior ALJ's RFC assessment had a res judicata effect absent any findings that suggested Plaintiff's condition improved. Therefore, Fourth Circuit jurisprudence based on *Albright* and *Lively* directs that separate claims are to be considered separately and that a claimant is not required to demonstrate new and material evidence to suggest her impairments increased in severity to prevail on a subsequent claim, but that a subsequent ALJ cannot find a claimant to have lesser restrictions than a prior ALJ absent a showing of improvement in the claimant's impairment. The SSA subsequently explained in Acquiescence Ruling ("AR") 00-1(4) that it interpreted *Albright* "to hold that where a final decision of SSA after a hearing on a prior disability claim contains a finding required at a step in the sequential evaluation process for determining disability, SSA must consider such finding as evidence and give it appropriate weight in light of all relevant facts and circumstances when adjudicating a subsequent claim involving an unadjudicated period."

In the prior decision, ALJ Herin indicated the following regarding deficits in adaptive functioning:

> While the evidence in this case supports a finding of a significant deficit in her functional academic skills, that evidence (including her work history, regular activities, living and social situation, educational history, and medical information) does not reveal significant deficits in any of the other skill areas described in the DSM-IV-R.

Tr. at 123. Although the ALJ acknowledged the January 2011 decision and noted that Dr. Bradley's opinion was rendered in connection with Plaintiff's previous application, he did not address the prior ALJ's specific findings at all steps in the sequential evaluation process for determining disability. *See* Tr. at 18, 28.

Despite the ALJ's error in failing to follow the precise requirements of AR 00-1(4), the undersigned recommends the court find the error to be harmless. The ALJ acknowledged that Dr. Bradley's opinion that Plaintiff met Listing 12.05 was rendered as part of the prior application. Tr. at 28. Although he did not cite the prior ALJ's findings with respect to deficits in adaptive functioning, the ALJ demonstrated awareness that the prior ALJ did not find Plaintiff met Listing 12.05. *See* Tr. at 18 (acknowledging the January 2011 unfavorable decision). The ALJ set forth limitations that were no less restrictive than those found by the prior ALJ, thus following the holding in *Lively*. He also considered Plaintiff's subsequent claim apart from her earlier claim and examined the evidence in the record before him, which is consistent with *Albright*. While the ALJ did not follow AR 00-1(4) to the letter, he avoided the errors the AR was promulgated to address. Thus, Plaintiff was not compromised by the ALJ's failure to specifically address the prior ALJ's decision.

Nevertheless, Plaintiff argues that if the ALJ had specifically considered the prior ALJ's finding regarding deficits in adaptive functioning, he would have found such deficits to exist based on the revised diagnostic criteria for intellectual disability set forth in the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-*

*5*"). This court has previously cited specific criteria in the *DSM-IV-TR* in remanding claims where it determined the plaintiff had deficits in adaptive functioning in at least two skill areas. *See Odom v. Comm'r of Soc. Sec. Admin.*, C/A No. 1:14-576-JMC, 2015 WL _____ (D.S.C. June 5, 2015); *Whites v. Colvin*, C/A No. 8:13-396-DCN, 2014 WL 4668656, at *11 (D.S.C. Sept. 16, 2014). However, it has not adopted a rule requiring that deficits in adaptive functioning be defined by the latest version of the *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM*").

The diagnostic criteria for mental retardation[10] set forth in *DSM-IV-TR* required the following:

> significantly subaverage intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 (Criterion C).

*DSM-IV-TR* (2000). *DSM-5* indicates that a diagnosis of intellectual disability requires that these three criteria be met:

> A. Deficits in intellectual functions, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, confirmed by both clinical assessment and individualized, standardized intelligence testing.
> B. Deficits in adaptive functioning that result in failure to meet developmental and socio-cultural standards for personal independence and social responsibility. Without ongoing support, the adaptive deficits limit

---

[10] The impairment was classified as "mental retardation" in the DSM-IV-TR, but was changed to "intellectual disability" in the DSM-5. The SSA similarly changed the impairment in the Listings from "mental retardation" to "intellectual disability" through a final rule effective on September 3, 2013. Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 FR 46499 (Aug. 1, 2013) (codified at 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 12.05).

functioning in one or more areas of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community.
C. Onset of intellectual and adaptive deficits during the developmental period.

*DSM-5* (2013).

Plaintiff's argument fails for several reasons. First, the diagnostic criteria set forth in the *DSM-5* was not applicable at the time of the ALJ's decision. *DSM-5* was released at the American Psychiatric Association's annual meeting in May 2013, approximately three months after the ALJ's decision. Kupfer, David, M.D. and Darrel Regier, M.D., M.P.H., American Psychiatric Association, DSM-5 Development, (June 9, 2015, 1:17 p.m.), http://www.dsm5.org/Pages/Default.aspx. It is unreasonable to expect that the ALJ would have analyzed deficits in adaptive functioning using criteria that were published after the date of his decision. Second, the description of "mental retardation" in *DSM-IV-TR* is significantly similar to the definition of "intellectual disability" in the introductory paragraph of Listing 12.05, which lends significant weight to reliance on the *DSM-IV-TR*. *See Whites*, 2014 WL 4668656 at *10–11, 14–15; *see also Technical Revisions to Medical Criteria for Determinations of Disability*, 67 Fed.Reg. 20, 018-01, at 20, 022 (Apr. 24, 2002). *But see Cox v. Astrue*, 495 F.3d 614, 618 n.4 (8th Cir. 2007) (noting that "the medical standard for mental retardation is not identical to the legal standard"). However, Listing 12.05 was not updated to reflect the changes present in *DSM-5*, which calls into question the general applicability of *DSM-5* to evaluation of intellectual disability under the Listing. Finally, the ALJ's conclusion that Plaintiff did not have deficits in adaptive functioning would remain unchanged by specific consideration of the

prior ALJ's decision under *DSM-5*'s diagnostic criteria for intellectual disability. The prior ALJ found Plaintiff to have a significant deficit in functional academic skills, but no significant deficits in any other skill areas. Deficits in functional academic skills are encompassed in *DSM-5*'s "A" diagnostic criterion, but are not included in the "B" criterion for "deficits in adaptive functioning." The prior ALJ found Plaintiff to have no deficits in the areas described as "deficits in adaptive functioning" under the "B" criterion set forth in *DSM-5*. Thus, the undersigned concludes that the ALJ would have reached the same conclusion if he had considered the prior ALJ's decision under the diagnostic criteria for intellectual disability set forth in *DSM-5*.

In light of the foregoing, the undersigned recommends the court find Plaintiff was not harmed by the ALJ's failure to explicitly consider the prior ALJ's findings at all steps in the sequential evaluation process for determining disability. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (affirming denial of benefits where the ALJ erred in evaluating a claimant's pain because "he would have reached the same result notwithstanding his initial error").

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

June 12, 2015                                  Shiva V. Hodges
Columbia, South Carolina                       United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).